IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2017

**STATE OF TENNESSEE v. JAMES A. KILGORE**

**Appeal from the Circuit Court for Marion County**
**No. 10230F      Thomas W. Graham, Judge**

_____

**No. M2016-02393-CCA-R3-CD**

_____

The Defendant, James A. Kilgore, pled guilty to attempted conspiracy to manufacture more than 300 grams of methamphetamine, a Class B felony, and attempted initiation of a process to manufacture methamphetamine, a Class C felony, in exchange for respective ten- and five-year sentences, to be served consecutively. The five-year term was to be served on supervised probation; whereas, the manner of service for the ten-year term was to be determined by the trial court. After a sentencing hearing, the trial court ordered that the Defendant serve the ten-year sentence in confinement, which, on appeal, the Defendant challenges as error. We affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jared C. Smith, South Pittsburg, Tennessee, for the appellant, James A. Kilgore.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; James Michael Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On December 7, 2015, the Defendant and twelve co-defendants were indicted for conspiracy to manufacture more than 300 grams of methamphetamine, initiation of a process to manufacture methamphetamine, and five counts of aggravated child abuse or

neglect by exposing a child to the initiation of a process to manufacture methamphetamine. On September 2, 2016, the Defendant pled guilty to attempted conspiracy to manufacture more than 300 grams of methamphetamine and attempted initiation of a process to manufacture methamphetamine.

At the plea hearing, the State recited the factual basis for the pleas as follows:

[H]ad the State gone to trial, we would be calling as our primary witness, Detective Chad Johnson with the Marion County Sheriff's Department, who would testify that back in 2014 and 2015, he was investigating, attempting to locate various methamphetamine manufacturing locations in Marion County. That in the process of that, he began interviewing individuals that showed a particular interest and had information regarding an address in South Pittsburg. The detective would further testify that he began checking NPLX records and various pseudoephedrine purchase records and running that particular address and noticing that numerous amounts of pseudoephedrine had been bought by numerous persons indicating that was their residence. The officer, the detective would further testify that over the course of two or three months prior to what ultimately was the arrest date in this event that he began surveilling this particular location in South Pittsburg. That he obtained photographs of various individuals going in and out of the particular residence and more importantly going in and out of . . . a building, portable type building located in the rear of the building. There were two there, but one . . . had a particularly large amount of activity. He would be introducing in photographs that showed various pictures of the [D]efendant and various pictures of the co-defendants and others entering in and out of this particular building. There would be specific photographs in the weeks and months leading up to the arrest date where the [D]efendant himself was photographed carrying items that are typically used in the manufacture of methamphetamine, such as torches, tubing, containers that appeared to have various bi-layers of liquids, tri-layer liquids in them. Some of these photographs would have individual small children in the proximity as he entered and exited this particular . . . building. Sometimes going in and out of the residence that was located there as well. There were also surveillance pictures of other individuals coming and going from the property. And in his testimony he would be describing a conspiracy of over 12 up to 20 people involved at this particular address purchasing pseudoephedrine, manufacturing methamphetamine, residing there, distributing amongst themselves, trading it. There would be additional statements by co-defendants . . . who would indicate that this conspiracy, in

fact, existed, and that methamphetamine was, in fact, being manufactured. Other individuals would testify that the [D]efendant himself had requested them to make various pseudoephedrine purchases in both Marion County, Hamilton County, and Alabama. Of course, the North Jackson, would be correct.

Judge, there would also be testimony from other law enforcement agencies on the date of the arrest. A search warrant was served on the location, . . . the [D]efendant . . . was found to be there along with approximately seven or eight more people. During the process of the arrest, several other folks showed up ultimately who were charged in this 13 defendant conspiracy.

There would be testimony from other members of the Marion County Sheriff's Department as to what was seen there. Members of the South Pittsburg Police Department, Mark Wilson with TBI, also would testify that various individuals also had possession of methamphetamine on their person. That there w[ere] numerous items that would corroborate the previous photographs . . . of [the Defendant]. These items were found in the building as suspected, appeared to be a meth lab, if not operational they at least very recently in the past had been operational. We would be entering statements by various co-defendants as to the cooking and the frequency of the cooking, and the presence of these children.

Judge, that would be the gist of this case. It would . . . indicate that . . . over 600 grams of pseudoephedrine had been purchased amongst all of these co-defendants and there would be testimony that when pseudoephedrine is used in this particular type of manufacture that conservatively 50 percent of it, you can have a 50 percent ratio return, so 600 grams of pseudoephedrine could conservatively create 300 grams of methamphetamine. Everything I've described except the purchases in Hamilton County and in Alabama would have occurred in South Pittsburg, Marion County, Tennessee.

The Defendant agreed to be sentenced to consecutive terms of ten years for the attempted conspiracy offense and five years for the attempted initiation offense. The Defendant further agreed that the five-year term would be served on supervised probation and that the trial court would determine the manner of service for the ten-year term.

The presentence report prepared by the Tennessee Department of Correction includes the following "Agency Statement" regarding the charges against the Defendant:

-3-

On September 24, 2015 your affiant executed a search warrant at the property in which the [D]efendant was found. During the search[,] officers discovered chemicals and equipment that are used to manufacture methamphetamine, finished product methamphetamine, and items used to smoke methamphetamine. The investigation into this property has revealed that the defendants along with others known and unknown are engaged in a conspiracy to manufacture methamphetamine. Officers also located 2 small children ages 2 and 4 inside the residence when the search warrant was executed. Officers also determine[d] that three more children who are 7 years of age also live in the residence. The residence had little food in it and the sleeping conditions for the children were very cramped.

The trial court conducted a sentencing hearing on November 21, 2016, at which Detective Chad Johnson with the Marion County Sheriff's Office testified that, in Marion County, "methamphetamine is probably our number two problem behind prescription medication." With regard to this particular case, Detective Johnson recalled that he received information that individuals were manufacturing methamphetamine at a particular address, and he pulled the pseudoephedrine purchase records for any individuals residing at that address. He discovered that the Defendant purchased 63.6 grams of pseudoephedrine from June 18, 2014 to September 13, 2015. Additionally, the Defendant tried to purchase pseudoephedrine five times, "but the system blocked him, because he was over his limit."

During the course of the investigation, Detective Johnson and another detective conducted surveillance of the address in question. Detective Johnson said that there was "an outbuilding located to the rear of the residence . . . where everyone was living. The outbuilding was a small building that had a couple of chairs in it, and then it also contained the meth lab that we ultimately found." One photograph taken of the scene showed "two small children playing within just a few feet of the entrance" to the outbuilding. Detective Johnson noted that "it's a dangerous environment for anyone to be in that's unprotected while they're that close to those type of chemicals."

After Detective Johnson testified on behalf of the State, the Defendant presented the testimony of four individuals and testified on his own behalf. Tim Roggli, the owner of Four Seasons Lawn Care and Landscaping, testified that the Defendant had been working for him for eight months at the time of the sentencing hearing. He said that the Defendant was a good employee, requiring no supervision and "was at work regularly." He stated that the Defendant could still work for him if the court granted the Defendant some type of alternative sentence.

-4-

Brent Basham, with the Probation and Parole Offices of the Tennessee Department of Correction, testified that he was assigned to supervise the Defendant while he was on bond awaiting sentencing. As part of the Defendant's conditions of bond, he was ordered to have a drug screen once a week, but later the screenings were changed to once every other week. Regarding the drug screenings, Mr. Basham stated:

> There's a couple of times that the drug screen was believed to be positive for marijuana, and so we . . . sent them for confirmation to the lab, like we do with any other potentially positive drug screen, and then the lab was sending us back -- we never got a confirmed positive from the lab, but there were, I believe, four different times -- well, three times that it was reported that it was diluted, and then one time we got an invalid report.

However, Mr. Basham recalled that the last drug test with suspect results was seven months prior to the sentencing hearing. In addition, Mr. Basham said that the Defendant always reported as required, he had always been able to contact the Defendant when he needed anything, and the Defendant was responsive when Mr. Basham left messages for him.

Lisa Hoosier, the Defendant's mother, testified that the Defendant "was a good kid. He was nosey, fast, and good hearted, and he's still good hearted." She said that, in school, the Defendant had problems with reading and failed two grades early on. He enjoyed going to school; "he just didn't understand what he was doing when he got there." Ms. Hoosier said that the Defendant had "weekend visitation" with his father, when his father "had a place to live." Asked about the amount of contact the Defendant had with his father, Ms. Hoosier replied, "He had too much contact with him." She said that the Defendant's behavior was good before his visits with his father, but, afterwards, "It'd take me two or three days to get it smacked out of him . . . because he'd come back with attitude, I can do what I want to, I can [do] it there, I can do [it] here. It was . . . an ever[y] week issue." She recalled that the Defendant started spending more time with his father when he got older, and, when he turned eighteen, "he just up and left and moved in with [his father]."

Ms. Hoosier testified that she signed for the Defendant's bond and that he stayed with her immediately after his release. After a couple of months, the Defendant moved out and "bought him a little camper and he's got it set up at a campground." When asked if she had noticed a change in the Defendant's behavior since his release on bond, Ms. Hoosier stated:

> He's doing good. He's a lot better. . . . [F]or a good while, at least a year and a half[,] I didn't see him very much and when I did see him, when

he did come over to the house he would be possibly high. I'm sure high, and he would come over only to get money. Be there Christmas Day or birthdays, whatever he knowed was the day mama's handing out money, that's the day he'd be there. He ain't that way no more, you know.

Ms. Hoosier said that she would support the Defendant if the trial court were to grant him some type of alternative sentence.

The Defendant testified that he went to live with his father at the age of eighteen because "[t]here wasn't as many rules." In 2006, about six months after he moved in with his father, the Defendant was charged with five counts of theft of property and six counts of forgery. He pled guilty to one count of theft of property and one count of forgery and was sentenced to three years' probation. His next felony charge was in 2008 for burglary of a vehicle that occurred while he was on probation for the theft and forgery convictions. Because of that conviction, he "did 22 months, a full revocation, and come out with 15 months of parole." He completed his parole with "no problems. [He] finished it out and hadn't been in any trouble in three years until this."

The Defendant testified that, after he was released on parole, he eventually moved in with a cousin, Tina Hood, and some other family members. A few months later, his father and an uncle also moved into Ms. Hood's house. The Defendant explained that his father and uncle "got kicked out of the place that they was living at . . . and Tina Hood . . . g[a]ve them a place to stay." Not long after his father and uncle moved in, the methamphetamine issue surfaced. The Defendant said, "He just brought it with him. It was like no one could tell them no. They thought that they could go anywhere and do it." Regarding his involvement with the present methamphetamine-related offenses, the Defendant said he "cooked a few there, but it was most [of the] time get[ting] the boxes for them." The Defendant said that the children at the residence were those of his cousin and an ex-girlfriend.

The Defendant expressed remorse for being involved with methamphetamine around young children. He stated that he did not get into trouble when he was not around his father and that his mother was "a great support group. She lets me know if I'm doing bad." He said that he obtained a steady job shortly after being released on bond. He maintained that, if placed on probation, he would "work everyday, and take [his] drug tests as [he was] suppose[d] to." If sentenced to community corrections, he assured the court, "I'll be here when I'm told to be here, to do as I'm told. I've done everything that I'm suppose[d] to since I've been out, paid my lawyer fees, reported for six months every week." He said that he had separated himself from his co-defendants in this case.

On cross-examination, the State confronted the Defendant with other convictions appearing in his presence report, including a misdemeanor theft which occurred a couple of months after the felony theft and forgery offenses for which he received three years' probation. There was also a charge for driving on a revoked license a few months after that, as well as a misdemeanor theft and the aforementioned felony burglary of a vehicle less than a year later. His probation was revoked, and he served twenty-two months in jail. After he was released on parole, he had a disorderly conduct charge. He then began purchasing pseudoephedrine for the methamphetamine production.

The Defendant admitted that his girlfriend at the time of the methamphetamine conspiracy had children who were also living in the house next to the building where the methamphetamine was being made. He insisted that he tried to get her to leave, but she did not. The Defendant acknowledged that two children belonging to his cousin also lived in the house. However, he denied that he cooked methamphetamine in the house where the children were living but admitted there was methamphetamine in the house.

The Defendant explained that, although he initially did not want to get involved with methamphetamine, he was "making money . . . off buying the boxes," and he "didn't have a job at the time." He was also using methamphetamine.

Maria Alvara, the Defendant's girlfriend at the time of the sentencing hearing, testified that she was an assistant manager of a Dollar General store. She was pregnant with the Defendant's child. She said that the Defendant was currently paying their bills, but the Defendant's mother and her mother would help support her if the Defendant went to jail.

At the conclusion of the sentencing hearing, the trial court ordered that the Defendant serve the ten-year portion of his sentence in confinement.

## ANALYSIS

The Defendant challenges the trial court's imposition of a sentence of confinement. He asserts that the trial court "fail[ed] to consider all of the sentencing alternatives. . . . [in that it] reviewed only full probation as a sentencing alternative."

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs,

932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

In determining the manner of service for the ten-year portion of the Defendant's sentence, the trial court first noted that the principles of sentencing indicate "the desire not to . . . incarcerate a person . . . if there's any way we try to find a way to do something short of full incarceration on a sentence." The court said that it reviewed the sentencing considerations in determining whether incarceration was appropriate and found "the[re] [are] very many negatives here unfortunately."

The court considered the presentence report and noted the Defendant's history of criminal convictions, which included three felony convictions committed while on

probation. The presentence report shows that the Defendant was convicted in Marion County case number 7884 of theft of property and forgery on August 9, 2006, and was sentenced to consecutive terms of eighteen months on probation. Then, on October 8, 2008, the Defendant was convicted in Marion County case number 8449 of burglary of an automobile and misdemeanor theft and was sentenced to an effective term of three years on probation. His probation in case number 7884 was fully revoked on October 8, 2008, and his probation in case number 8449 was fully revoked on April 27, 2010. The court summarized that the Defendant had three felony convictions, four misdemeanor convictions, and "at least two, maybe three probation revocations, which is a terrible record, and that's one of the things that we look to is previous actions and criminal history of the [D]efendant."

The court next considered the Defendant's physical and emotional condition and social history. The court noted that the Defendant's social history was not good "based on the discussion of him being kind of hither and yon" and having "very little record of employment." The presentence report lists the Defendant's current employment with Four Seasons Lawn Care and Landscaping as his only record of employment.

The court next considered the facts and circumstances surrounding the offenses and the nature of the offenses. The court noted that the Defendant admitted that "he knew exactly what was going on. He didn't like it he says, but he knew what was going on. [He claimed that] [h]is father was the bad influence." The court observed that it was "really troubling" that the Defendant and the others living in the house "didn't really care about themselves or anybody else," and there were "all these little kids running around."

The court considered the Defendant's prior history again, this time giving special attention to the Defendant's history of failure to appear. The presentence report indicates that a capias was issued in October 2006 because the Defendant failed to appear on a charge of misdemeanor theft.

The court considered the Defendant's potential for rehabilitation and determined that it "can't give him anything but a negative on that, because his history shows that he's been on probation, he's committed crimes over a period of almost 10 years when he had a chance to do so, and he ended up getting into trouble." The court specifically addressed whether it appeared that the Defendant would abide by the terms of probation and commented, "Well, we've said that already, that he's not abided by terms of previous probations."

The court next determined that the "interest of society in being protected from possible future criminal conduct of the [D]efendant [is] great." The court elaborated that the "fact that he has several theft offenses in addition to this drug thing, but he's had

problems with theft since he was 18 years old.  He's got -- all the burglaries.  He's got out and out theft, he's got forgeries . . . ."

The court next considered whether measures less restrictive than confinement had frequently or recently been applied unsuccessfully and observed that "[t]hey certainly have been frequently applied in that those probations ended up being revoked, and all that in some ways is recent, it's within the last eight or ten years," and the Defendant is only twenty-eight years old.

The court lastly considered whether a sentence of full probation would unduly depreciate the seriousness of the offenses, noting that the offenses were particularly serious in that the house where the "meth cooking [was] going on" was in a populated part of town and in close proximity to parks and other houses.

The record shows that the trial court engaged in a detailed and thorough analysis to determine whether the Defendant should be granted anything less than a sentence of full confinement.  The court was certainly aware of the Defendant's request for consideration for a variety of non-incarcerative options, such as probation and community corrections, and the court, in its discretion, determined that incarceration was appropriate.  Again, the "abuse of discretion standard[] accompanied by a presumption of reasonableness" applies to all sentencing decisions, including "questions related to probation or any other alternative sentence." Caudle, 388 S.W.3d at 278-79.  The trial court did not abuse its discretion in imposing a sentence of confinement.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-